My name is Rocky Cole and I represent the appellant Marcos Perez-Trevino. I raised three issues today and I'll begin with the second and third issue, the multiple conspiracy instruction issue, as well as the sufficiency of the evidence on the conspiracy case. I think what this case really is about is under what circumstances you can get the multiple conspiracy instruction. If not this case, what type of case could you get a multiple conspiracy instruction? At page 708, I would key the court to transcript 708, in which Judge Reed indicates that typically on a motion for judgment of acquittal, she sort of treats them as pro forma, you know, most of the time you make the motion and it's denied. But she did flag this as a particularly case that she wanted to look at very closely. The reason is because if you look at the record in this case, you have Mr. Perez-Trevino who essentially floats through the case. He's not connected to any other of the named conspirators. At page 36 of my brief, I outline all of the named conspirators, Danita Urban, Scott Matthews, Danella Castanedos, Brian Swartz, Rogelio Avalos-Sanchez, Jennifer Marlos-Flores, Miguel Mendoza, Alvaro Hernandez, and others. He's not connected to any of them via phone calls, via any recorded messages, via any controlled buys. What about the idea that he's kind of a safety source, if I can use that term, that when you couldn't get them from Murillo, you could get them from him? You know the theory. Yeah, and that would be for Jessica Seneceros. She had one connection with Mr. Murillo Mora, January of 2015. He lost trust in her, cut off contacts with her. After that point, the record shows that Mr. Perez-Trevino's transferred methamphetamine to her. But if you look at the United States versus Snyder case, at most what that would suggest would be mere overlap of personnel. Now the key issue in this case is that the government admitted at page 845 of the transcript that these were different organizations, the Murillo Mora organization as well as Marco Perez-Trevino's organization. The argument that I wanted to make to the jury at closing argument, obviously with a case where they had a large seized quantity of methamphetamine. It was seized in Oklahoma. They had a number of small, for lack of a better term, with the Marshalltown Police Department, were just sort of drug user type arrests. Caught for a broken taillight, methamphetamine sprinkled in the car, nothing related to distribution or anything along those lines. What about the fact, counsel, your time is short. It's the reason I'm being a little pointed. What about the fact that it's a fairly small area and a fairly compressed area of time? What about that argument which undergirds the government's brief? I think that's what's so troubling about this application of conspiracy, is that it's so broad, the way that this is interpreted. If you look at that Berger case, it's not a methamphetamine case, but it's that first conspiracy Supreme Court case where they really outlined the concerns, is that if you outline conspiracy so broad, the entire community can be involved. And as I look at this case, this is construed so broadly, anyone who's a methamphetamine dealer in the community can be hooked in to the drug conspiracy. What the government has said over and over again is it doesn't matter if they know, don't know any of the other conspirators, it doesn't matter. As long as they have a shared passion for distributing methamphetamine, they're hooked in. I don't think it's that broad, and the elements aren't that broad. There has to be an intentional agreement that you tried to conspire with others. Well, you said, you started to say before you were questioned that you, the argument I wanted to make, dot, dot, dot.  And hold on. Oh, I'm sorry. I'll let you say it eventually, but I want you to explain why you couldn't make that even without the instruction, because I presume the argument you're going to make is my guy wasn't in the conspiracy with these other people. He was in a, he was, if he was a drug dealer, he was dealing with different people. He never agreed with the charged people here to commit the crime. And I understand why you might think highlighting to the jury that there's a concept of multiple conspiracies would help you, but couldn't you still argue the same thing without the instruction? Not with how the government explained and how the conspiracy was argued. That her view is that as long as there is a shared desire to distribute methamphetamine, that's enough. And to answer your question, the one that I was going to argue was the text of the instruction itself, and this particular sentence that I highlight, is that if the prosecution fails to prove this as to a defendant, oh, I'm sorry, if the prosecution fails to prove this as to the defendant, you must find the defendant not guilty, even if you find that he or she was a member of some other conspiracy. That's the law that we'd be able to transmit to the jury. And that is exactly what I wanted to argue. It was the only argument that I could make, Your Honor. I couldn't argue that because it wasn't in the instructions. You know how important instructions are in closing an argument, that you can highlight it, and then you can say, look, you must acquit if there is, if he's part of some other group. What's the best statement of the law that you've seen on when a defendant is entitled to this instruction? I think you have to hook it into, and we do, there really isn't a lot of case law in the Eighth Circuit. All right, well, that's what I was wondering. We do have a case, some cases that say something to the effect that if the law, forego the multiple conspiracy instruction. So that leaves you wondering, when do you ever get the multiple conspiracy instruction? On super close cases just like this one. Because I think that if you look at, I think what the court meant when it talked about if there's evidence is sufficient to establish an overall conspiracy, then you're not prejudiced. You couldn't say that you were part of another one. This is one of these close cases, Your Honor. And with Judge Reed, not overly inclined to grant these sorts of motions in this way, and she flagged this as a really, really close case. And the reason she did is there was no connections. You look at this as two different franchises, the Mora franchise, Marco Perez Torvino, classic sort of user, small-time dealer. There's no connections. There's no control. Well, there's a control by, but it's not to any of the other named members. And so that's precisely, I think, the problem in this case is what would have hurt by the same token, Your Honor? You know, they've talked about sufficiency. Ultimately, the jury is the one that makes that choice. And so if not this. Did she say anything in response to your post-verdict motion? You know, she just denied it. You know, I had a lot of hope when she made that statement, but she did not. Just a summary denial? Yeah. Yeah. So that's why we'd request that. Now, as to the speaking of standards, the suppression issue, I do want to briefly touch upon that. It's a very similar issue in the sense of we have to be careful that we don't water down the standard on particularized criteria in need for the inventory exception, that it becomes so watered down that it becomes functionally meaningless. If you look at this case, what the government relied on to justify the inventory search was the following language from the Choteau Police Department. You shall conduct a thorough and uniform search. That said, no other details, no other criteria, zero. And the officer in this case didn't rely on any other criteria. Counsel, what about the Lowe case, the decision of this court? And I don't think they even had a written inventory policy, did they, in that case? I think in that case, though, Your Honor, there was the officer testifying as to their own policy. And I think in the record here, he didn't elucidate on what the oral policy was. He solely relied on this written policy and said, this is what I applied. If you look at the Kennedy case, that was a good policy improperly applied. This is even worse. Essentially no criteria at all. And I'd invite the government. Well, I'm not sure that that's a fair statement. The search language talks about a thorough and uniform inventory of the vehicle and its compartments. And it seems to me the real question is, is the cooler, which is a container in the car, does it fit within the compartment definition, right? I mean, and that seems to me the better part of the argument. I mean, I think the policy as written is a policy that gives guidance.  And if you went beyond the guidance, what were his reasons? And was it part of a standardized search? Or was it a pretext? It seems to me that's the real question. And that's not in the policy. That's the problem, is that that policy doesn't provide criteria. It's left to the officer's discretion, which was precisely what the court had as a concern in the South Dakota, the Opperman, and the Wells case. So I think that's the issue, and I'll reserve the remaining time for my rebuttal. Well, hold on. We'll give you 30 seconds on rebuttal. But why wasn't there probable cause for this search? I'm sort of confused why. That wasn't relied upon. I know. I don't understand why. That was not relied upon. There was marijuana. Didn't they find stuff in the car, marijuana and drug paraphernalia? Marijuana, yes. That was not relied upon, and they relied solely on the inventory search. I think that would be a waiver argument, Your Honor. And I think in terms of the investigatory purpose, it's present in the law. Other than waiver? I mean, wouldn't that obviously give probable cause to search containers and rocks? Because that wasn't argued, I don't know at what point he actually saw it, whether once he began the inventory search that's when he smelled it. It wasn't something that was brought up or argued. All right. All right. We'll give you your 35 seconds in rebuttal. Thank you, Mr. Cole. All right, Mr. Bell, we'll hear from you. Thank you, Your Honor. Excuse me. My name is Murray Bell, and I have the privilege of representing Mr. Juan Flores in this matter. Excuse my voice. That's okay. You can move the microphone down a little bit, though, so it hits you. Okay. That helps. All right. Thank you. What I want to talk about here is the first issue in my brief. I want to start there. This is a question of whether statements made by a Mr. Morella-Mora to a Mr. Avalos-Sanchez could be admitted at trial as under the conspiracy exception, conspiratorial exception to the hearsay. And what happens is that Mr. Avalos-Sanchez testified that he was a driver for Mr. Morella-Mora and that he drove him from city to city as they did their business, and as a part of that they would just talk. And as one of those occasions as they were just talking, Mr. Morella-Mora told him that Mr. Juan Flores had been his driver and that they had a falling out and they're no longer together. Our objection was that's hearsay and it doesn't further the conspiracy. Now, that's all there was, and Mr. Avalos-Sanchez was asked, did Mr. Morella-Mora tell you to do something with that information? No. What was the nature of when it came up? Well, we were just killing time. I was driving and he just told me about it. Now, there's nothing more about it. Counsel, what about all our cases that say identifying co-conspirators' role in conspiracy is a statement in furtherance of the conspiracy? We have several cases that say that. There are cases that say that. And there are cases from the Eighth Circuit that say the opposite of that. For example, I want to read from a case. This is a case, United States v. Snyder. It's cited in my brief. This is a case dealing with a 240-acre farm where they're farming marijuana. A female comes to this farm and visits. A person, Yost is his name, a co-conspirator, gives her a tour of the farm. He explains what the participants are doing and what their jobs are. This court ruled that there was nothing in the record suggesting that Yost's description to this female of the operation and the duties of the participants in any way furthered the objection of the conspiracy. Now, that's a much greater involvement or statement about the conspiracy than what we have, oh, he used to be my driver, but we had a falling out and we don't rely on him, I don't use him anymore. Now, Ms. Williams, during the hearing we had at the conclusion of the evidence, we have this Bell Procedure hearing, United States v. Bell. Ms. Williams did provide some additional information that was not actually part of the testimony, but she makes the argument that he was saying, basically, here are the people I used to work with, but I don't work with them anymore, so I don't want you to work with them. Well, none of that was said by the witness. That was all inputted to the witness by Ms. Williams during an argument. Now, one of the things that's interesting is Ms. Williams states in her brief that there is no case law to suggest that whether the statement was made in furtherance is measured by the listener's viewpoint, and that's an interesting statement, and frankly, I couldn't find any case law either. However, what we have, by the very nature of the way the evidence comes in, unless the statement itself, on its face, shows that it's in furtherance, we have no idea what the speaker is thinking. An example of a case that would show on its face is, assume Mr. Morimurilla tells Mr. Ávila Sanchez, go tell Juan to deliver a pound to John. On its face, that's in furtherance. But if you don't have something that's on its face in furtherance of the conspiracy, what do we know what the declarant, out-of-court declarant, is thinking? He didn't give him any instructions to Mr. Ávila Sanchez. He didn't tell him, don't deal with him. So we don't have anything. Maybe the court needs to consider this problem that there is no case law that's suggesting the recipient of the information's view of what's going on is relevant, because what you end up with is nothing from the out-of-court declarant that gives you the information, and the perception of the recipient of the information, we were just shooting a ball, excuse my language. We were just killing time. And he didn't tell me to do anything. He didn't tell me, don't deal with that. He didn't say anything. So maybe the court needs to look at that question and consider whether there should be some case law on the question of whether the recipient's understanding or view of what that was about is relevant. Otherwise, what you're dealing with is some evidence here, no evidence here, but according to the government, we ought to go where the no evidence is. Well, that's contrary to everything we do in court. You know, at the very minimum, we go to the probable cause. In court, generally, in a civil case, we're at preponderance. But what they're saying is we've got some evidence over here, we've got nothing from the declarant, well, but we go with the declarant. That means it's in furtherance. Or we go with, assume that the declarant said it in furtherance. I agree, Judge Benton, that there are cases that say what you exactly read. But we have this case on Snyder, which is clearly beyond what we've got in our case here. I mean, he takes her around a 240-acre farm, explains what everybody does. Now, the court said, well, maybe he was showing off to his girlfriend. That could have been what was going on. But clearly, in that case, the court said, a conspirator's casual comments to people outside or inside the conspiracy do not meet the in furtherance requirement. That's a direct quote from Snyder. Now, that's an old case. It's an oldie but a goodie. It's 1983. But it's never been overruled. Now, there are some cases, subsequent cases, that seems to mangle that bit, seems to confuse the argument. But that's where we're at with that. So the court should consider this question. Should we be? Should there be some case law on this issue? Now, I couldn't find any. I admit that. You appeared to have a question, Judge Benton. No, no. It went away. Go ahead. All right, so that's our argument. We think that the court should consider that because there's a lot of cases that say... Now, even in Snyder... Let's see. Snyder quoted cases from the Fifth Circuit, two cases from the Second Circuit. There's another case from the Ninth Circuit that says clearly that they must further the common objectives of the conspiracy. It is not at all clear how saying, hey, that's a guy in the past I dealt with. He's not even a part of the conspiracy anymore, in my mind. How does that further the conspiracy? Our argument is it does not. I believe I've reserved two minutes for rebuttal. If anyone has questions, I'd be glad to answer them. Very well. You may reserve the balance. Thank you for your argument. Mr. Taylor, we'll hear from you. May it please the Court, I'm Wally Taylor, and I'm representing Daniela Castellanos. The government's allegation against Ms. Castellanos was that she assisted Mario Morello in his drug operations by wiring money or delivering drugs. The first issue I want to address, unless the Court has specific questions, is the admission of the wiretap evidence. In this case, there were previous wiretaps, but the wiretap on the phone that was used in the evidence in this case was called Telephone 16. The affidavit for that phone was based on conclusions and, I quote, beliefs of the investigating agent, with no facts supporting those conclusions or beliefs. The government, of course, says, you know, there were facts, but if you read the affidavit, the facts that are there concern other suspects, other actions that don't really connect to this phone. What about the fact that the affidavit incorporates ten previous affidavits? Isn't that enough when you put it all together? I knew you'd ask me that, Your Honor. I think that the problem there is that the facts in the other affidavits were not really set out in this affidavit and they don't make the connection, and although in this case Judge Reed had issued most of the prior orders and that she issued this one, I think you have to look at this affidavit within the four corners of this affidavit. And, in fact, as I recall, I think Judge Jarvie might have issued a couple of those previous orders. So that seems to take those affidavits at least out of the construct that Judge Reed did all of the affidavits and therefore she knew the facts. But still, there have to be... If they're incorporated by reference, doesn't the court have access to the prior affidavits? I think, though, that the problem, Your Honor, with that is that if the prior affidavits suffer from the same deficiencies that they're based on conclusions and beliefs with no connection and no facts set out, or at least insufficient facts, that that still does not bolster the current affidavit. And that's totally a different question than whether or not this affidavit has to be considered on the four corners of itself. Well, if you're incorporating, I guess that... Well, I'm not incorporating the affidavit. The affidavit itself, try to incorporate it. Can they do that? And if so, if the court doesn't have access, incorporating doesn't mean a thing. But if the court has access... But that access has to at least be such that the issue in court for this affidavit or this order has to have sufficient facts presented to it in order to make the determination. The government relies on... I don't understand that answer. Are you saying that, yes, the court can consider the prior affidavits if they're incorporated by reference and they're available in the clerk's office? If the court has access to those and if those prior affidavits are sufficient to be relied upon to bolster this affidavit, yes. Okay, so the judge here was not limited to the four corners. All right. The government relies on U.S. v. Thompson, which talks about being able to rely on the experience and knowledge of the officer in making certain inferences from the facts. I took that, the holding from Thompson, back to where it first originated in the Eighth Circuit, and that case relied on Ornelas v. U.S., a U.S. Supreme Court case. But the Ornelas case was not a wiretap case. It was a search of an automobile, and what the court made clear there was that the officer could make inferences from facts that were set out, not that the officer could just come up with opinions and conclusions just based on his experience and nothing else without setting forth the facts that he based those conclusions on. If there are no more questions on that, I'd like to go on to a couple of the sentencing issues. The first issue has to do with criminal history. Ms. Castellanos had essentially no criminal history except for some offenses of driving under suspension or driving while barred, which in Iowa are aggravated misdemeanors, but the possible sentence is two years. And the argument the government makes is that under the sentencing guideline and application note, if the maximum sentence is a year or more, that's a felony and does not come within the exception for the driving offenses not being counted. However, 21 U.S.C. 802 subsection 13, which is definitions relating to drug offenses, says that you go by what the offense is designated in the state law. Doesn't our Phillips case say that you can count these very Iowa aggravated misdemeanors? In that case, there was no challenge made that the guideline conflicts with the statute. It was just the guideline says it's a felony, therefore it's a felony. But the Supreme Court in Labonte and Stinson was very clear that the statutory definition or statutory provision preempts or overcomes a definition in the guidelines. And I think that's the situation we have here. Well, you say the statute here. Which statute are you referring to? 21 U.S.C. 802 subsection 13, which is the definition in the drug chapter for the felonies. And it says a felony or misdemeanor is whatever it's classified as under state law. Yeah, but does that definition purport to govern the sentencing guidelines like the definition in Labonte did? Well, Labonte and Stinson both, they were not addressed to this specific issue, obviously, but they do make clear that the sentencing guidelines have to give way to a conflicting statute that is in conflict with the guideline. I see my time is up unless you have some more questions. You may reserve the balance for rebuttal. Thank you. Thank you. We'll hear from Ms. Williams for the government. Your Honor, it's Lisa Williams from the Northern District of Iowa here on behalf of the United States. You can adjust that if it's too low. There you go. I think I'll start where we left off, if that's okay with the court. Phillips is on point, Your Honor. This has already been adjudicated, this issue of these Iowa driving convictions. They do constitute felonies. And I did not bring my code section, but I believe that the definitional section of Title 21 begins as used in this section. And so the definition of a felony offense used in Title 21 governs. I bet it says chapter or title counsel, one of those words, but proceed. But there would be some limiting word on there to bring it into the confines of Title 21. I don't think I've ever quite heard an argument that the Title 21 definitions should be applied to guideline sections when the guideline sections contain their own. I just heard the argument this morning. But I think that that argument is foreclosed by our circuit president in Phillips and that those convictions were properly scored and that there was no error in calculating her criminal history category. And then with respect to the issue of the wiretap, I think that we got to the point in argument where Mr. Taylor did concede that you could reference or incorporate by reference prior affidavits into one affidavit. When you look at all these, it doesn't ever really say that Maria Moore is actually using this phone. Right? It doesn't ever really just have a simple plain English sentence that says that. If you look at the probable cause section, it talks about being up on his phones, Target Telephone 9 and Target Telephone 15, and that he was identified through the Title III wiretaps on those two phones, and that's how agents discovered that he was also using Target Telephone 16. It's sure hard to read, you know. Well, I will grant you that, Your Honor. It's even harder to write. Proceed. But the PC, how this developed is, and it is because it's so wordy and so lengthy that it's hard to get that the PC is so clear, because the PC here is that they had intercepted him on Target Telephone 16 on other people's phones in drug-related calls. They had recorded telephone calls of him setting up drug deals on the telephone that the government sought to get the T3 order on. And so that's PC right there. You hear the guy using the phone trying to do a drug deal. Most of the attack from the defendant comes on the fact that officers, firm and makers can't reach these conclusatory statements. But what that overlooks is that the beginning of every affidavit is a detailed description of their training and experience. These are not people who are working a checkout lane in a grocery store saying, hey, I think these are drug-related conversations. These are experienced drug enforcement agents who have been trained, who have experience, and who rely on their education in reaching these conclusions. They have participated in control buys. They have participated in drug investigations. And so when they hear a phone call that says, hey, can I get an 8-ball, they know based on their training and experience that that refers to an 8-ball of methamphetamine, which is commonly referred to as 3.5 grams. And so they are allowed to reach these opinions and beliefs because it's based on substantial training and experience. And so I would submit that there is ample probable cause for the wires. And then the other side of that coin is the necessity. And these affidavits detailed in excruciating detail, I believe it's something like paragraphs 45 to 108, of all of the things that the government tried to do before seeking application for this T3 wire cap. They detailed the control buys, the attempts to get people to cooperate, trash rips, money laundering investigation, grand jury. It's all there in the affidavit, and it lays out to the district court why necessity exists. And I would also like to mention that the government doesn't have to prove that it had no other option. Necessity is not that strict of a standard, but it does have to prove that it reasonably exhausted other options, which the government did in this case. And so I don't think that the district court erred in denying the motion to suppress the wire argument. I think one of the more interesting arguments before the court is Mr. Bill's argument regarding the co-conspiracy testimony and the standard. Because there is no, I agree, and I was unable to find it, whether or not this is an objective or subjective standard on whether the statement is furthering the conspiracy. But the government submits that it has to be an objective standard. And at trial, a lot of questioning went to these witnesses by the defense of, why was he telling you this? Why do you think he wanted you to know this information? And the witness did say, I have no idea. One witness, Rachel Bronis, says, we spent a lot of time in the car, and we had to talk about something, and this is what he wanted to talk about. But in response to that, I said, well, are you a mind reader? No. Do you know why he was telling you? No, I don't know. And it doesn't matter what the listener thinks is the reason that the information is being imparted. What matters is, does the information being imparted further the conspiracy? Can it move the conspiracy along? And as I argued before the district court, there are many ways that this type of information furthers the conspiracy, because this is all classic statements and furtherance, identifying co-conspirators, identifying the ways that the conspiracy operates. And when Mario Murillamora tells Rachel Bronis, hey, I gave Daniela Castellanos $5,000, but she stole that money from me, well, Rachel Bronis now knows that she can't trust Castellanos with money. Yeah, but let's talk about Flores specifically. Sure. What evidence, what was, tell me the evidence against Flores. I know about the statement, just that he was driving him around practically, which doesn't say anything. So what other evidence was there? With respect to the co-conspirator statements or evidence in general? With respect to Flores, yeah. You mean insufficiency? Oh, yeah, kind of a portion, yeah. So part of the wire investigation was a wiretap on Derek Plunkett's telephone. That was Target Telephone 11. And there were significant numbers of texts and calls between Mr. Plunkett and Mr. Flores setting up methamphetamine transactions. Did any of them relate to driving? Not driving Murillo, no, because at the time that Plunkett and Flores were dealing with each other, Murillo had lost his source of supply and kind of dropped out of the picture. And Flores has risen up to one of those supply levels. The driving was relevant because that came from Rogelio Avila Sanchez. And that is Mr. Murillo's cousin. And what he says is, look, I was using meth and I needed money. And so my cousin said, hey, you can come work for me and I'll pay you some money. You drive me around, you kind of be my errand boy. And he said that during the course of that relationship, Murillo said, oh, well, Flores, he used to drive me around. He used to serve the role that you're serving now. Well, he didn't even say the second thing. He says driving him around practically, right? Yes. That's the whole amount that's at issue here, right, at that point? And then he says there's some – and then he told me they had some dispute about business. And then Flores didn't work for him anymore. And that's – which also goes into the harmless error argument. Because when you look at a defendant who's on a T3 setting up drug deals, is it prejudicial to admit this statement that he used to drive Murillo around and the government says no? Well, Mr. Flores' point is about that single paragraph and those statements that we're talking about, right? Yes, Your Honor. Okay, proceed. But I think it is important that the current driver, again, knows who was filling my role before and I'm not allowed to trust him. Like, you know, they had this business. They had a falling out. How close – Avilo Sanchez was the driver for four months and 14. How long before then had Flores been the driver? You know, I think – and Avilo Sanchez was the end of 14 through 15. And I believe his testimony was that he saw Murillo and Flores together once when they went to this trailer. Murillo was going to buy a trailer using meth, and Rogelio shows up, and he sees Flores and Murillo and Daniela Castellanos all arrive together, and that was shortly before he began working. Well, do you think – does that imply – favorable to you, does that imply that he was the driver shortly before? I think you can infer that. Yeah, it's implied. That's all I was driving it. Go ahead. Pardon the pun. Yeah, go ahead. But I think that a fair reading of the purpose behind this hearsay exception and the bail procedures and whether the information furthers the conspiracy really means that it should be read as an objective standard, that we shouldn't be in the business of trying to get into the minds of people to parse out why they think they were being told certain pieces of information. These are the folks that had to make the agreement, right? We get the agreement from them, from their minds, correct? Well, or their guilty pleasure. I mean, these are folks that all said that they were in the agreement, yes. Okay, proceed. But – Why is that the purpose behind the rule? If the statement doesn't actually further the conspiracy,  I'm arguing that opposite point, Your Honor. If it doesn't further the conspiracy, it should not be admissible. And that's the problem with the subjective approach, is if you call John and John says, oh, I think he told me this because it helps move the conspiracy along, but the statement, no fair reading of that, you know, oh, we went to McDonald's yesterday or the sky is blue. No fair reading of that statement could further a conspiracy along. It doesn't matter what the guy thinks. The admissibility of that statement should be governed in the information that's being conveyed by the speaker. And that should be analyzed as an objective standard. But I thought you were arguing even if this was idle chatter that didn't actually further the conspiracy, if you can make an argument that objectively it should have furthered the conspiracy, then it's admissible. Well, Your Honor, I am not arguing that this was idle chatter that didn't further the conspiracy. No, the defense is arguing. The defense is arguing. Yeah, but you're saying even if they're right and it was idle chatter and nobody paid any attention to it and acted on it and it didn't further the conspiracy, it's still admissible because as an objective matter, I think you're saying it should have or could have. Is that the argument? Is that what you think the law should be? I don't think I'm making such a strong argument. But the argument that I'm making is in assessing whether the information furthers the conspiracy. We should not be getting into the minds of the listener. It doesn't matter what they thought. Okay, so it doesn't matter at all what the speaker means. It doesn't matter at all what the listener hears. It matters only that it might in some world further the conspiracy, even if nobody ever intended it to have any relationship to the conspiracy. It might matter what the speaker means, Your Honor. But in terms of the listener and what information, why they think they're being told the information, that I don't think is relevant to the analysis. I think the core issue is what information was conveyed. And then maybe. Doesn't this objective standard just result in us, as judges, just sort of conjuring up whatever idea we might have as to how it might somehow fit into the conspiracy? Is that a standard? I think that's what the court has been, maybe not conjuring is the right word, but I think that the case law before this, that's what the court has been doing, is when a statement identifying other co-conspirators, and then you look at the analysis of why that furthers the conspiracy. That law is based on inferences about the information that was transmitted, not a witness testifying. He told me this so I would know who not to deal with. And so, in a way, that's why I think, really, what's important is what information is conveyed, and does it fit into what we understand from past precedent of information that furthers a conspiracy. Turning to the inventory search. What about this Snyder case? What's your view about the persuasiveness of that? I think with all of this, the whole analysis is so fact-dependent. And, again, in looking at not just what the statements are, but what they are in the context of the entire trial and how they fit, that Snyder is distinguishable. And Snyder, again, didn't imply or impart a subjective standard, but it objectively looked at the information that was conveyed and said, we don't see how this furthers the conspiracy. Yeah, I just don't know whether that's the same kind of objective standard that you're describing. If the court said nothing in the record in that case suggests that the statements furthered the objectives of the conspiracy, that sounds like a fact-based determination as to whether the conspiracy was furthered. I don't know. We'll have to look at it carefully. Turning to the inventory search, unless there are other questions. Yeah, on that inventory search, how is this policy any different than the one in Wells? I thought the one in Wells said that the Florida Highway Patrol was supposed to inventory all articles in the vehicle. That's correct, Your Honor. And this one says something about all contents of the vehicle, but it doesn't address containers. The vehicle's in all of its compartments, and it also addresses the purpose of the search, which is to do a thorough inventory to protect the police of claims of lost valuable items. Isn't that the purpose of all inventory policies? Sometimes public safety, Your Honor. This one notably did not have a public safety purpose. But the cooler, and there were pictures of it, although I apologize, I can't imagine what the quality of the pictures are once they reach the 8th Circuit, because I know that they weren't good for the district court. But this is not a small cooler. This is a large-size cooler that any number of items could be being stored in. And if the purpose is to make sure that a thorough inventory of all potential valuable items has been taken in the vehicle, then certainly the cooler needs to be searched in order to comply with that policy. I do want to point out on this probable cause issue. Wait, before you go to probable cause, now why does that make it different from Wells? Because the policy says the inventory is supposed to be thorough, and the Florida one didn't say that? Well, it's a thorough inventory of the vehicle and its compartments. Well, you're not saying the cooler was a compartment of the vehicle, are you? I'm not. It is a container within the vehicle, and the policy doesn't specifically address containers. But the policy doesn't need to specifically address containers if it is applied in a uniform way. And then to get into trouble with an open-closed container policy, there also has to be some sort of finding of pretext, investigatory pretext on the part of the officers, a finding that the district court specifically said in its opinion did not exist, that she found no evidence whatsoever that this was a pretextual search. And then she added maybe two sentences about why it wasn't a pretextual search. I know the court commented that never once did they ask consent to search the vehicle, that the officer said that he didn't think he was going to find it. He really thought he was just doing an inventory search of the vehicle. And so there is a finding by the district court that this is not a pretext search. And so without that, even if they're – Did Wells involve a finding of pretext? I thought Wells just said because there was no policy that constrained the officers, the evidence was properly suppressed. That's correct, Your Honor. The pretext analysis comes in when the policy does not address an open or closed container. No, I'm saying I thought Wells was a case where there was a search of a container, the policy didn't address open and closed containers, and the court said the evidence was properly suppressed because there was no cabin on the discretion of the officers and there wasn't anything in there about a pretext finding. That is correct, Your Honor. Okay. You think there's absolutely no pretext in Wells when the court talks about turning something into a purposeful and general means of discovering evidence of crime in some of the – I know they don't use the term protest. Pretext, I'm sorry, I said the wrong word. Well, I thought you meant when you said – No, both of you can. Go ahead. I thought you meant there was a requirement of finding that these particular officers were engaged in a pretextual search where, as Wells was saying, there's a danger if there's no policy that searches could be used for that purpose, and that's why we require the policies. That is all correct, Your Honor. The pretext issue that I'm arguing arises with the issue of how the inventory search was completed. And in analyzing that, putting aside the first problem, was there a problem with the search, what this court also has to find to overturn the search is that it was a pretext search. And so rather than get into a big debate about the first prong, of course, as the government, I would like to turn to the prong where there's absolutely no evidence that there's a pretext search and, in fact, a finding by the district court that it was not. And given the standard of review and the fact that these findings are on the record, I don't think there's – I don't think that the district court erred in refusing to suppress the evidence. When we look at the record, how clear is the record about the characteristics of the container itself? Because that's one of the big determinants of the latitude to be given to the officer. So there is the photograph of the cooler sitting exactly in the car where it was. That's in the record. That's attached as a suppression hearing exhibit to the motion to suppress. Trooper, the Oklahoma trooper, described the cooler. But it is, to give reference to the court, it's just one of those standard white coolers with a blue lid, very. And that's in the record? That is in the – the photographs of the cooler as it was found in the card and a description are in the record, Your Honor, yes. Where are you getting this, what you're calling second prong of the inventory analysis? Because I'm still wondering why Wells doesn't say if there's no policy governing the discretion of the officers on containers, then the search is impermissible. So it's the Rowland case from the circuit, Your Honor, the 2003. And what it says is even if the officer fails to conduct a search according to standardized procedures, this does not mandate suppression of the evidence disclosed as a result of that search. There must be something else, something to suggest that the police raise the inventory search banner in an after-the-fact attempt to justify a simple investigatory search for incriminating evidence. What did you want to say about probable cause? I do want to dispute the weight. Now, the government on appeal has not argued probable cause, but we argued it before the magistrate court and the district court and both the R&R and the opinions from those judges drop a footnote that say that they are not going to address the government's probable cause argument because they're going to uphold the search on an inventory basis. And you decided to abandon that on appeal or not to pursue it further? I would say not to pursue it further, Your Honor. But I didn't want to leave the court the impression that the government had never once argued probable cause. That was, in fact, one of our very strong arguments before the court when the motion was pending. Did the district court give a reason for declining to address it? Yes, they did. They dropped a footnote, Your Honor, in both written and they just said we do not have to reach the issue because we uphold the search on an inventory. So that's the whole reason and nothing but the reason? That's correct, Your Honor. That's all I was going to say about the inventory search, and then I was going to turn to the multiple conspiracy jury instruction, and sufficiency of the evidence issue unless the court wanted to discuss inventory anymore. So there's a few problems that the government has with the argument today, a few things that I just wanted to point out. I know that the court asked Mr. Cole whether the district court had given any reasoning to explain its denial of his motion, and he said no, it was just very succinct. The district court issued a 20-page opinion order denying his motion for judgment of acquittal, and so I think that the district court laid out in 20 pages its reasoning about why it did not believe that there were multiple conspiracies present. Well, he says that his client was not involved with the rest of the people, and that's his whole point, that that's what the evidence is, and he should have been allowed to argue that my guy was maybe a drug dealer but with a different agreement. And that's what the bench asked him today, why couldn't you argue that at closing without this instruction, and I don't think that there's any reason why he could not have argued that. He could have stood up before the jury and made the same argument. Do you really think that's realistic? I mean, as a person who sat on the trial bench a long time, when you decline to give an instruction and no one's ever asked, am I still going to be free to make the argument, Judge, and the judge doesn't say fine? Aren't you at risk that the judge is going to come off the bench unglued, unhappy, and bad things are going to happen to your case? I think that if you misstate the law, you bear that, you run that risk. But the judge has already said that there is no basis for a multiple conspiracies instruction, right? Isn't that what she said? Yes, Your Honor. And once she said that, if you argue multiple conspiracies, isn't she going to feel like you've invaded the province of the law? No. In fact, I think just the opposite. So the court gives the pretty standard Eighth Circuit conspiracy jury instruction, which has, in my opinion, a lot of ways that a defendant can attack a conspiracy case. The jury has to find that he's a member of this conspiracy, and you can stand up and put that. I used PowerPoint in closing. But you can put that jury instruction on the PowerPoint behind you and point to it and say you have to find that he's a member of this conspiracy. Didn't this judge take away that defendant's theory of defense? No. I think that Mr. Cole could have stood up and made that argument. There's a mere presence part to that instruction. This is merely present at the scene, does not mean that one is part of a conspiracy. You can stand up and say that, merely being present. Or even though there's no buy-sell agreement, as long as you properly resuscitate the Eighth Circuit law, I think that it's fair game to stand up and say all he did was sell. All she did was buy. There is no evidence that they reached an agreement together with a common purpose and gave each other mutual assistance to go and distribute drugs. You don't need a jury instruction to do that, Your Honor. The ones the court gave get you there. And so, yeah, I see Mr. Cole's point. It would be nice to have a multiple conspiracy jury instruction. Well, if not this case, when is what his argument to us was? In any of the cases where the Eighth Circuit found that multiple conspiracies existed. The IRS case from Minnesota, that would be one to give it in. There's some. This isn't the case. And to argue that he is a lone wolf by himself really misstates the evidence. Well, I don't think that's the argument. I think he's not a lone wolf.  Exactly. Another pack of wolves. That's right. Go ahead. He is distributing to Jessica Acosta and not just—or excuse me, Sinaceros. She got divorced halfway through the case, and that's why we call her by different names. So I apologize for that. But he distributed to Jessica Sinaceros and called her up, said, I'm going to deliver, have my guys deliver eight pounds of dope at your house. Let them in. Let them use your house. He fronted that methamphetamine to her, which creates a relationship where he knows she's going to go out and sell it and then return the proceeds to him. He sold to Vanya Guatemara, who also used Mario Murilla as a source of supply. He tried to collect money from Vanya earlier from her source of supply, Bote, went and knocked on her house and said, you owe Bote this money. It's time to pay up. Oh, and by the way, if you want to start selling meth for me, that would be good. I got another girl, Jessica. She's working out really well. He used Reagan Victor's house, her basement, to help Jacket distribute methamphetamine and later distributed methamphetamine to Ms. Victor and also dealt with, according to Ms. Victor, her boyfriend at the time, Rafael Avalos Castellanos. And so to say that he's not in the group is a misstatement of the trial evidence. To prove the existence of a conspiracy, you have to have common purpose and mutual assistance. Those are the two big buzzwords that the government has to establish. And common purpose is here. And those are the factors that the court has previously, but the time, the geographic location, the type of drugs, everything is the same. And so then the question really is, is there mutual assistance? And I think that when the prior cases look at multiple conspiracies, what they get hung up on is that there is no mutual assistance between the conspirators, and that's not the case here. He is receiving assistance from the people who testified against him about how they helped further his drug conspiracy, which was this large, albeit loose, conspiracy in Marshalltown. And so I think that the court was right in not giving the multiple conspiracy jury instruction and right in denying the defendant's motion for a judgment of acquittal. All right, very well.  Thank you, Your Honors. Mr. Cole, we'll hear from you in rebuttal. With my 35 seconds, I would just direct the court to suppression transcript page 8, and I think that demonstrates that there was a criminal purpose, Your Honor. I don't think that that's required. Why can't we, you mean on the inventory? Well, on the question of the inventory, and I would agree to the extent that the government cites the Eighth Circuit case, that is not consistent with Wells. Wells is directly on point, and I think the entire purpose of the inventory, as you had mentioned, is to ensure that it doesn't become a wide-ranging, and it's a procedural safeguard to ensure that. And to Judge Erickson's point, What about probable cause? I mean, I know they didn't argue it, but if it's obvious, isn't it obvious that if there's drug evidence in the car, I don't know where and when he saw the marijuana in terms of when that actually occurred, when he began the inventory search or not. I thought he said as soon as he leaned inside the vehicle, he smelled the odor of raw marijuana. And I don't know if that was before he began the inventory search or not. It was right before he began it. Okay, so I think- If my clerk's right. It was not, in my recollection, it wasn't relied on. I'll have to check the report and recommendation. I think it was waived. You're suggesting he might have looked in the cooler before he found the drug evidence? The cooler was the meth. The marijuana was on the console. No, no, I know, but I thought your point was if he didn't find the marijuana before he looked in the cooler, then he wouldn't have had probable cause yet. I think that's the issue, Your Honor. When did he find the meth-covered dollar bill? I believe that was the inventory search, Your Honor. That was not in the cooler, though, was it? The meth-covered dollar bill? I thought he found that before he did the cooler. I do not think it was, Your Honor, but I don't think that was justified to do the search. Go ahead. Did you want to say something to Judge Erickson? I thought I interrupted you. Well, just the question of I think that's the whole concern is that it did not address containers. It addressed the compartments, and that's the entire purpose of this is to limit discretion. And all those cases where there was not a written policy, there was oral description in the record where the officer gave a detailed oral description of what the policy was verbally, and that that's how those were justified. Just one last thing. Roland is obviously out there, and it's got a predecessor, Mayfield, that says essentially the same thing. How do we get to the point where we just say, well, as a panel, that Wells controls in the face of those two precedents? Well, I think the court constantly has to look at whether there's any previous case law, and that stare decisis, you have to look to the Supreme Court. I don't think you can reconcile those cases, and I think this court to the extent it finds a conflict should make that finding. Thank you. Thank you. All right. Mr. Bell, we'll hear rebuttal from you. Let me put this down. My short people need it lower. That's why we have the button. Good thing. Coming after these two tall people. I wanted to address Ms. Williams' argument that in this conspiratorial statement, they should apply an objective standard. I think the greatest argument against that is Snyder. Snyder would have been decided different if it was an objective standard. Look at all the information that this female was given. All the things that some later case says do cause it, do cause it to be admissible, but in this case it wasn't because there's no further evidence that what was given to this lady, this woman, was in furtherance. Now, Ms. Williams also said that when asked, Mr. Sanchez says, I don't know why he told me. I guess the question from that is, that begs the question, how does it further the conspiracy if the recipient of the information doesn't even know why he has it? That creates a whole different problem, it seems to me. But couldn't every person conveniently say then that they didn't understand what that was all about? Well, anybody can say something conveniently, sure. I can't eliminate that possibility. But this seemed to be, I mean, he was given an opportunity to explain why he thought he had the information, and he didn't do that. And he might have all sorts of reasons, including protecting his friends, not to have an answer to that question, right? I guess, certainly. I can't foreclose that possibility. But I think, hey, my time's up, but I think an objective standard misplaces the responsibility. Thank you, Your Honor. Thank you, Mr. Bell. Mr. Taylor, I hear from you in rebuttal. If I could, in rebuttal, I'd like to pick up that last sentencing issue I didn't have a chance to address earlier, and that's rule in the offense. All right. I'm not sure that's proper rebuttal, but we'll allow it. We'll allow it briefly. Do you have any real rebuttal? With respect to the wiretap, first of all, the law requires strict compliance, and that's because wiretaps are so intrusive, and the law is set up to be extremely strict on that, and the courts have said that. Ms. Williams used the example of relying on the officer's experience by saying, well, an eight ball, the officer knows, is an eighth of an ounce. That's the classic drug lingo that an officer certainly can render an opinion on, but you won't see anything like that in the affidavit in this case that we're relying on as being simply conclusions and beliefs that are not based on any fact or that the officer has any basis in fact to make a, quote, And as far as the necessity argument, we've set out in our briefing all of the missed opportunities, the things that the officers could and should have done prior to getting the wiretap. Thank you. Very well. Thank you. Thank you all for your arguments. I want to note that all three counsel for the appellants were appointed under the Criminal Justice Act, and the court appreciates your willingness to accept the appointments. The case is submitted, and the court will file an opinion in due course.